# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

MOSES EARL INGRAM,

     Petitioner,

v.                                                Civ. No. 19cv0749 MV/KK

DEWAYNE SANTISTEVAN,

     Respondent.

## MAGISTRATE JUDGE'S PROPOSED
## FINDINGS AND RECOMMENDED DISPOSITION[1]

Police arrested Petitioner Moses Earl Ingram after he severely beat Amber Simpson, his former girlfriend, chased her across the street, then forced her into a car and drove away, pursued by the police. After a trial in the Tenth Judicial District of the State of New Mexico, a jury convicted him of first-degree kidnapping, second-degree attempt to commit first-degree murder, aggravated fleeing a law enforcement officer, criminal damage to property, and unlawful taking of a motor vehicle. (Doc. 11-1 at 40–42.) The state district court sentenced him to a total term of 31.5 years of imprisonment. (*Id*. at 41.) The New Mexico Court of Appeals affirmed the convictions and Mr. Ingram's subsequent state court petitions for habeas relief were denied. (*Id*. at 219, 276, 299; Doc. 11-2 at 148; Doc. 11-3 at 4.)

Now before the Court is Mr. Ingram's *pro se* petition for federal relief under 28 U.S.C. § 2254[2] ("Petition"), in which he seeks reversal of the kidnapping and attempted murder

---

[1] United States District Judge Martha Vázquez referred this case to the undersigned to conduct hearings as warranted, and to perform any legal analysis required to recommend an ultimate disposition of the case. (Doc. 5.)

[2] Mr. Ingram's Petition is titled "Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241." (Doc. 1.) In the Petition, Mr. Ingram indicated that he is challenging the validity of his conviction under 28 U.S.C. § 2255. (*Id*. at 3.) Because Mr. Ingram is a state prisoner, the Court construes the Petition as a petition for a writ of habeas corpus under 28 U.S.C. § 2254. *See* (Doc. 4.)

convictions. (Doc. 1 at 15.) Having carefully considered the parties' submissions, the record, and the relevant law, I recommend that the Court DENY Mr. Ingram's Petition and DISMISS this matter with prejudice.

## I.     BACKGROUND AND STATE COURT PROCEEDINGS

### A.  Facts Leading to Arrest

Mr. Ingram and Ms. Simpson began living together as domestic partners in January of 2009 when Ms. Simpson allowed him to move into the home she shared with her two young children in Tucumcari, New Mexico. (Audio of Trial Testimony ("CD"), *see* Doc. 12, Sept. 13, 2010, at 10:18:28-10:19:02; 10:20:18-10:21:11.) The relationship quickly soured when Mr. Ingram became very jealous and controlling. (*Id.* at 10:23:25-10:25:19.) By April 22, 2009, Ms. Simpson became a complaining witness in a criminal case against Mr. Ingram. (*Id.* at 10:25:20-10:25:51; 10:26:23-10:26:53.) Mr. Ingram spent a few weeks in jail but upon his release he immediately began harassing and threatening Ms. Simpson, which landed him back in jail. (*Id.* at 11:43:30-11:45:07; 11:51:30-11:51:57.) By July 21, 2009, Mr. Ingram had once again been released from custody, and Ms. Simpson became frightened. (*Id.* at 10:26:54; 10:27:12; 10:39:45-10:40:00.) Ms. Simpson's fears were realized when three days later, on July 24, 2009, Mr. Ingram came to her home and brutally beat and then kidnapped her. (*Id.* at 10:40:30-11:52:50)

Ms. Simpson testified that at approximately 8:45 p.m., she was sitting on her porch when Mr. Ingram walked up and asked if he could talk with her. (*Id.* at 10:40:22, 10:44:16-10:49:37.) She said no, that he was going to get in trouble, and that she was going to call the police. (*Id.* at 10:49:38-10:49:51.) Undeterred, Mr. Ingram walked onto Ms. Simpson's porch where he accused her of being in a relationship with his brother Sammy and told her he wanted her to come with him to confront Sammy. (*Id.* at 10:50:00-10:50:53.) When she refused to go with him, Mr. Ingram beat

2

Ms. Simpson in the head and face until "blood [was] pouring out of [her] face like water." (*Id*. at 10:51:26-10:53:23.) At one point Mr. Ingram put his fingers inside of Ms. Simpson's mouth and tried to tear her mouth while saying he was going to "rip her f***ing face off." (*Id.* at 11:17:40-11:18:00; 11:19:29-11:20:10.) Ms. Simpson described that the beating went on for a long time, felt like forever, but probably lasted five to ten minutes. (*Id*. at 10:53:24-10:53:43.) Eventually Mr. Ingram told Ms. Simpson she was going to cry and get the cops called on him and demanded that she give him her car keys. (*Id.* at 10:53:44-10:54:07.) Rather than give the keys to him, Ms. Simpson used her key to set off her car alarm and threw the keys toward a fence. (*Id*. at 10:54:08-10:54:37; 11:28:47-11:30:49.) Mr. Ingram then forced her to pick up the keys and directed her to get into her car, but when Ms. Simpson did so, she scooted to the other door, left the car, and ran across the street to her neighbor's front door. (*Id*. at 10:54:40–10:58:46.)

Ms. Simpson screamed for help, prompting a call to the police, but before the neighbor came to his front door, Mr. Ingram caught Ms. Simpson, dragged her away from her neighbor's property by her hair, and made her get onto the floorboard of her vehicle behind the driver's seat. (CD, Sept. 10, 2010, at 4:04:26-4:12:12; Sept. 13, 2010, at 10:59:41–11:01:31; 11:46:30-11:46:55; *see* Doc. 11-1 at 220.) Ms. Simpson's neighbor testified that Ms. Simpson had bled so profusely while on his property that when he saw the puddles of blood, he kind of freaked out, knew it was serious, and did not know whether she had been stabbed or shot. (CD, Sept. 10, 2010, at 4:02:25-4:03:14; 4:06:16 – 4:08:37.)

Officer Pete Vargas arrived at the scene, parking behind Ms. Simpson's car. (CD, Sept. 9, 2010, at 4:19:24; Sept. 10, 2010, at 11:03:35.) Mr. Ingram evaded Officer Vargas and drove away, pursued by Officer Vargas and, shortly thereafter, by Officer Clay Cullison. (CD, Sept. 9, 2010, at 4:23:03; Sept. 10, 2010, at 11:04:00–11:18:47.) Ms. Simpson testified that, as he was driving, Mr.

3

Ingram told her that he had come to kill her, she told him she knew that, and he "swung" behind the seat with his right hand and struck her five times in the head. (CD, Sept. 13, 2010, at 11:00:00–11:01:02; 11:01:38-11:01:58; 11:31:00-11:31:18.) She also said that Mr. Ingram told her, "We're both going to die tonight" as the car left the road and hit a tree in a wooded area approximately three miles from Ms. Simpson's home. (*Id*. at 11:02:25–11:02:35; 11:49:50-11:50:03.) Mr. Ingram fled on foot. (*Id.* at 10:51:00–10:53:30; *see also* Doc. 11-1 at 220-221.)

While Officer Cullison was waiting with Ms. Simpson for paramedics, Mr. Ingram's brother, Stanley Ingram, "ran up on scene" and Officer Cullison told him to leave without questioning him. (CD, Sept. 10, 2010, at 2:11:06; Sept. 13, 2010, at 11:03:00-11:03:42.) Police finally located and arrested Mr. Ingram on August 10, 2009, in Clovis, New Mexico. (*Id.* at 2:23:49.) In a phone call recorded while he was detained in the Curry County Detention Center, which was played at trial, Mr. Ingram can be heard stating, "She's lucky I didn't kill her." (CD, Sept. 10, 2010, at 9:47:50.)

The jury was shown photographs of Ms. Simpson's injuries and several witnesses testified about them. Officer Cullison testified that when he discovered Ms. Simpson inside the crashed vehicle, she was crying, covered in blood, and "kind of slumped over," and there was "blood pretty much all over the back seat." (CD, Sept. 10, 2010, at 11:19:35, 11:22:28 – 11:23:15.) Both Ms. Simpson's eyes were swollen shut. (*Id*.) Because of the "disformity" to her face, he did not recognize her. (*Id*. at 11:22:40.) Officer Vargas stated that Ms. Simpson had a "real swollen" face; black eyes; a "severe gash" under her right eye; and blood "all over herself." (CD, Sept. 9, 2010, at 9:54:35, 9:58:34, 16:58:15 – 16:58:52.) Ms. Simpson testified that Mr. Ingram beat her so severely that her eye socket was fractured in two places, she had to have eight stitches to close the wound beneath it, she had bruising on her chin, neck, ear and lips, and she was unrecognizable.

4

(CD, Sept. 13, 2010, at 11:05:00-11:06:08; 11:06:39–11:08:40; 11:27:00-11:27:56.) Ms. Simpson's face remains scarred. (*Id.* at 11:09:04.)

## B. Facts Related to Trial

The State charged Mr. Ingram with eleven crimes, including aggravated battery against a household member. (Doc. 11-1 at 1.) After six were dismissed, the case against Mr. Ingram proceeded to trial on the charges of first-degree kidnapping, second-degree attempt to commit first-degree murder, aggravated fleeing a law enforcement officer, criminal damage to property, and unlawful taking of a motor vehicle. (Doc. 11-1 at 1, 15, 27.)

Mr. Ingram asserted to his second trial counsel, Ben Mondragon, that he was not the perpetrator of the charged crimes[3] and Mr. Mondragon pursued a mistaken identity defense, arguing that it was Mr. Ingram's brother Sammy Ingram who had beaten and kidnapped Ms. Simpson. (Doc. 11-1 at 221, 11-2 at 149–151; CD, Sept. 9, 2010, at 2:18:34.) Regarding identity, Officer Vargas testified that he identified Mr. Ingram, with whom he had gone to junior high school, as the driver. (CD, Sept. 9, 2010, at 9:10:00.) Officer Cullison testified that he could see a "large male driver" but, because the windows were "dark tinted," he could see only silhouettes in the car. (CD, Sept. 10, 2010, at 11:11:45–11:13:00, 1:55:49, 2:06:04.) Officer Cullison further testified that he did not see the driver get out of the wrecked vehicle, and, although he searched the woods briefly, he did not find him because the night was "pitch black," there was no moon out, and the "thick" woods limited visibility surrounding the car. (*Id.* at 11:20:43, 11:23:51–11:24:59, 1:53:53.) A witness to the altercation, Ms. Simpson's neighbor, testified that he saw a black male

---

[3] The state district court found that Mr. Ingram told Mr. Mondragon he was not the perpetrator after an evidentiary hearing on Mr. Ingram's ineffective assistance of counsel claim, at which Mr. Ingram testified. (Doc. 11-2 at 149–151.) As discussed further below, Mr. Ingram's assertions in the Petition are insufficient to rebut this finding of fact and the Court, therefore, presumes it is correct. *Frederick v. Quick*, 79 F.4th 1090, 1104 (10th Cir. 2023) (on habeas review, courts presume that state court findings of fact are correct unless rebutted by clear and convincing evidence).

"dragging [Ms. Simpson] by the hair," that he did not see the male get into the car, and that he told the police that he "suspected" it was Mr. Ingram because he knew that Mr. Ingram and Ms. Simpson had been in a relationship. (*Id.* at 4:04:44, 4:05:40, 4:12:33.)

In support of the mistaken identity defense, Mr. Mondragon argued that only one witness other than Ms. Simpson had identified Mr. Ingram as the perpetrator. (CD, Sept. 13, 2010, at 12:37:28, Sept. 15, 2010, at 10:22:03.) He also presented evidence that Ms. Simpson was dating Sammy Ingram and that officers failed to question Stanley Ingram at the scene. He adduced evidence that law enforcement had not collected any forensic evidence tying Mr. Ingram to Ms. Simpson's injuries. Finally, Mr. Mondragon presented three witnesses who testified that Ms. Simpson had a history of untruthfulness. (Doc. 11-2 at 149–150; CD, Sept. 15, 2010, at 10:17:32–11:03:00; Sept. 13, 2010, at 1:54:43, 1:58:58, 2:02:40.) Mr. Ingram did not testify, and Mr. Mondragon did not present evidence on Mr. Ingram's capacity to form the specific intent to kill Ms. Simpson. (CD, Sept. 13, 2010, at 2:49:00; Doc. 11-2 at 150.)

Mr. Mondragon also sought a change of venue for the trial. Before trial, Mr. Ingram's former counsel had moved for a change of venue, claiming that, "due to extensive and prejudicial pretrial publicity[,]" Mr. Ingram could not receive a fair trial in Quay County. (Doc.11-1 at 4); *see* NMSA 1978, § 38-3-3 (2003) (governing venue changes in criminal cases). However, former counsel did not attach an affidavit to the motion as required by statute. (Doc. 11-1 at 4); *see* § 38-3-3(B) (providing that a change of venue based on unfair publicity requires an affidavit by the requesting party or attorney). After the jury had been seated, Mr. Mondragon argued that

> although a jury was seated, there was at least 23 out of 43 that had seen coverage. There was additional that had known. With that said . . . we exhausted all the jurors in terms of everybody and we did have enough for two alternates. My only objection . . . is I worry that this was not a broad-based selection of Mr. Ingram's peers. With that said, . . . we would renew our motion for a change of venue.

6

(CD, Sept. 9, 2010, at 12:25:00-12:25:40); Doc. 11-1 at 17.) The state district court said that it understood the motion to raise the issue of "racial balance" and that former counsel had also raised that issue. (CD, Sept. 9, 2010, at 12:26:00–12:26:30.) Mr. Mondragon responded that he was "renewing" the argument that Mr. Ingram was being denied "a fair . . . selection of his jury peers." (*Id*. at 12:26:30–12:26:40.) The state district court then explained that

> there were no [African American individuals] who appeared for this jury panel. I don't believe there were any even on the panel . . . there was a large group of people pooled to get to the remaining jury panel. The court has no memory of any [African American individuals] being excused for cause early on. Clearly there were no [African American individuals] that appeared for jury today. There were no arguments made regarding the racial balance or the manner in which excusals were used. So the court finds that that's not a valid grounds for a change of venue[.]

(*Id*. at 12:26:40– 12:27:32.) It also said that "the fact that there was publicity" was "handled very appropriately and we have a fair panel . . . the motion for change of venue is denied." (*Id*. at 12:27:32–12:27:45.)

After the state rested its case, Mr. Mondragon moved for a directed verdict, in which he argued that the state had failed to prove that Mr. Ingram formed a deliberate intent to kill Ms. Simpson and to prove the elements of kidnapping. (CD, Sept. 13, 2010, at 12:15:50–12:32:15.) The state district court denied the motion. (*Id*.)

After the close of evidence, the state district court instructed the jury that, to find the defendant guilty of attempt to commit first degree murder, the state had to prove that Mr. Ingram "intended to commit the crime of first degree murder, [and Mr. Ingram] began to do an act that constituted a substantial part of the murder but failed to complete first degree murder . . . . " (CD, Sept. 15, 2010, at 9:14:30). The court also instructed the jury on the elements of first-degree murder, including that the State had to show that Mr. Ingram acted "with the deliberate intention to take away the life of" Ms. Simpson, that the jury may infer deliberate intent "from all the facts

7

and circumstances," and that, "to constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice." (*Id*. at 9:15:10–9:16:30.) Finally, the trial court instructed the jury that, to find Mr. Ingram guilty of kidnapping, the state had to prove that he "took, restrained, or transported [Ms.] Simpson by force, [and he] intended to hold [Ms.] Simpson against [her] will, to inflict death or physical injury on Amber Simpson or for the purpose of making the victim do something . . . . " (*Id*. at 9:14:00).

The jury found Mr. Ingram guilty of all five charges (Docs. 11-1 at 28–39) and the state district court sentenced Mr. Ingram to a total term of 31.5 years in the custody of the New Mexico Corrections Department. (*Id*. at 40–41.)

## C.  The Direct Appeal

On direct appeal, Mr. Ingram sought reversal of his convictions, arguing, in relevant part, that the state district court erred in denying his motion for a change of venue, the jury selection was unfair because the jury did not include any African American members, the evidence was insufficient to support the convictions, and his counsel was ineffective by failing to object during the jury selection process. (Doc. 11-1 at 117–126.) The New Mexico Court of Appeals held that Mr. Ingram had not preserved his change-of-venue or jury composition arguments and that Mr. Ingram had "failed to identify any defect and articulate how any element of a particular crime was not established by the actual evidence submitted." (*Id*. at 233–236.) Finally, the court determined that Mr. Ingram had not established a prima facie case of ineffectiveness with respect to jury composition. (*Id*. at 235.) The Court affirmed his convictions, and the New Mexico Supreme Court denied his petition for writ of certiorari. (*Id*. at 237, 238, 276.)

**D.  The First State Habeas Petition**

Mr. Ingram, proceeding *pro se*, sought state habeas relief (the "First State Habeas Petition"). In relevant part, he argued that he, "an [A]frican [A]merican[,] had no [A]frican [A]mericans on his jury" which "denied [him] a fundamental fair trial_the conduct was deliberate and designed, a scheme." (*Id*. at 278; *see also* 284 ("The defendant an [A]frican [A]merican was not tried by a jury of his Peers. (There were no [A]frican [A]mericans on his Jury")[)].) He did not adduce any evidence regarding the Quay County census data or whether there were African American people in the jury pool. (*Id*. at 277–295.) The state district court denied the First State Habeas Petition on the merits, holding,

> The crime [Mr. Ingram] was charged with occurred in Quay County, New Mexico. As can clearly be seen by a review of the census records of Quay County, Quay County has a very small African[]American community. No African[]Americans were dismissed from the jury panel, as part of initial qualification, or during the selection of the jury. As the law expects criminal matters to proceed to trial in the county where the crime was committed, Quay County was the appropriate place for trial, and the first ground for relief [in the state habeas petition] is denied.

(*Id*. at 299.) As to Mr. Ingram's change of venue motion, it found,

> [t]here was no difficulty in finding a fair and unbiased jury in Quay County. The jury panel showed no indicia of widespread community knowledge of the facts of the case, or a widespread community belief in regards to the guilt or innocence of [Mr. Ingram]. No evidence was presented prior to trial that would justify a change of venue, and no evidence has been presented in th[e First State Habeas Petition].

(*Id*. at 300.)

**E.  The Second State Habeas Petition**

One month later, Mr. Ingram, acting *pro se*, filed a document captioned "Successive Petition for Writ of Habeas Corpus," in which he contended that (1) the convictions for kidnapping and attempted first degree murder violated the prohibition against double jeopardy; and (2) counsel was ineffective for failing to, *inter alia*, consult with an expert for the purpose of crafting

"temporary insanity" or "extreme emotional disturbance" defenses. (*Id*. at 302–303.) The state district court appointed the New Mexico Public Defender's Department to represent Mr. Ingram, after which his counsel amended the petition (the "Second State Habeas Petition") and attached the results of a forensic interview conducted by Dr. Susan Cave reflecting Dr. Cave's opinion that "[i]t seem[ed] highly likely" that Mr. Ingram was unable to form specific intent to kill Ms. Simpson at the relevant time. (*Id*. at 309, 316, 325-327.) The state district court ordered the State to "respond to the allegations that the acts of Mr. Ingram should or should not be considered unitary for the purpose of sentencing under attempted murder and kidnapping. Also they should address the specific intent issue." (*Id*. at 331.) Respondent filed a response to the Second State Habeas Petition. (*Id*. at 333.)

After an evidentiary hearing, the state district court denied Mr. Ingram's petition and made the following findings.

1) "Mr. Ingram told Mr. Mondragon that he did not commit any of the acts he was charged with and that he had no information about what happened to the victim to assist Mr. Mondragon in the preparation of his defense,"

2) "Mr. Ingram was insistent on pursuing a defense of mistaken identity,"

3) the "investigator and Mr. Mondragon located a significant number of weaknesses in the State's case [including] not having adequate photo documentation, not requesting analysis of stains which may have been blood, and significant lines of questions that brought into doubt State witnesses['] biases, prejudices, and certainty of identification,"

4) "Mr. Mondragon, as defense counsel, competently and effectively pursued a defense strategy at trial regarding sufficiency of the evidence, mistaken identity, credibility and

biases of the witness, and clearly and effectively pointed out the insufficient and incompetent portions of the State's investigation,"

5) "During the meetings between Mr. Mondragon and Mr. Ingram, Mr. Mondragon had no reason to believe or suspect that the defendant had any cognitive challenges such as defects in memory, language, or the ability to maintain focus and attention," and

6) "Mr. Ingram's statements to his lawyer[] that he did not commit the crime and was not present when the crime was occurring[] meant there was no reasonable basis to investigate the [']ability to form specific intent['] defense."

(Doc. 11-2 at 149–151.) The state district court concluded that Mr. Mondragon's focus on the mistaken identity defense was reasonable and, therefore, he had provided effective assistance to Mr. Ingram. (*Id*. at 152.) It did not address Mr. Ingram's double jeopardy argument in writing. (*Id*.) The New Mexico Supreme Court denied Mr. Ingram's *pro se* petition for a writ of certiorari. (*Id*. at 154; 11-3 at 4.)

**F.  The Federal § 2254 Petition**

On August 2, 2019, Mr. Ingram, then an inmate at Lea County Correctional Facility, filed the Petition. (Doc. 1.) Presently, Mr. Ingram is an inmate at the Northeast New Mexico Detention Facility in Clayton, New Mexico. *See* New Mexico Corrections Department Offender Search, https://www.cd.nm.gov/offender-search/, last accessed February 8, 2024.) Hence, for purposes of the "in custody" requirement of § 2254(a), Mr. Ingram was in custody at the time he filed the Petition and remains in custody to date.

**II.   STANDARD OF REVIEW**

Under 28 U.S.C. § 2254, a federal court may only grant a state prisoner's petition for a writ of habeas corpus when the prisoner is held "in violation of the Constitution or laws or treaties of

the United States." 28 U.S.C. § 2254(a). In general, the prisoner must also have exhausted his state court remedies. 28 U.S.C. § 2254(b)(1). When the prisoner's claims have been adjudicated on the merits in state court, a Section 2254 petition can only be granted if the state court's decision was contrary to, or unreasonably applied, "clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [United States Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court decision "unreasonably applies" clearly established federal law if it "correctly identifies the governing legal principle from [United States Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* "Where … the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but [also] objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *see also Woods v. Donald*, 575 U.S. 312, 316 (2015) ("[A]n unreasonable application of [United States Supreme Court] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (quotation marks omitted). "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Welch v. Workman*, 639 F.3d 980, 1010 (10th Cir. 2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (brackets omitted).

Federal review of a state court's determination that a claim lacks merit is "highly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537

U.S. 19, 24 (2002)). "[F]ederal habeas relief [is precluded] so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough*, 541 U.S. at 664.). The state court need not cite to United States Supreme Court cases, or even be aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Indeed, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning" at all. *Harrington*, 562 U.S. at 98. Unless the state court indicated that it did not consider an issue on the merits, even a summary denial will be deemed "on the merits" for purposes of Section 2254 review. *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004); *see Cullen*, 563 U.S. at 187 ("Section 2254(d) applies even where there has been a summary denial."); *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) ("[W]e owe deference to the state court's *result*, even if its reasoning is not expressly stated.").

Review under Section 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 180-81, 185 n.7; *Black v. Workman*, 682 F.3d 880, 895 (10th Cir. 2012). Such review must be "highly deferential," and the petitioner bears the burden of proof. *Cullen*, 563 U.S. at 181; *Woodford,* 537 U.S. at 24-25.

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable. If this standard is difficult to meet, that is because it was meant to be…. [Section] 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.

*Harrington*, 562 U.S. at 102-03 (citation and quotation marks omitted).

In Section 2254 proceedings, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Welch*, 639 F.3d at 991 ("We presume the factual findings of the state court are correct unless the petitioner rebuts that presumption by clear and convincing evidence."). A petitioner is entitled to an evidentiary hearing when "his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief." *Anderson v. Attorney Gen. of Kan.*, 425 F.3d 853, 858 (10th Cir. 2005). However, factual allegations must be "specific and particularized, not general or conclusory." *Id.* at 858-59. "Moreover, an evidentiary hearing is unnecessary if the claim can be resolved on the record." *Id.* at 859.

> [B]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate. In practical effect ... this means that when the state-court record precludes habeas relief under the limitations of § 2254(d), a district court is not required to hold an evidentiary hearing.

*Cullen*, 563 U.S. at 183 (citations and quotation marks omitted). I will consider Mr. Ingram's claims in light of the foregoing standards.

## III.   ANALYSIS

Mr. Ingram asserts that: (1) his trial counsel provided him with ineffective assistance by pursuing a defense based on mistaken identity, which was "not viable" (Doc. 1 at 7–8); (2) he was convicted of attempted murder without sufficient evidence that he intended to kill Ms. Simpson (*id*. at 11–12); (3) his convictions for kidnapping and attempted murder violate his right to be free from double jeopardy (*id*. at 8–11); and (4) his trial was unfair because (a) he was denied "a jury of his peers as no African American jurors were provided" (the "Jury Claim") and (b) the trial court denied his motion for a change of venue (the "Venue Claim"). (*Id*. at 13.)

I find that the State has waived its affirmative defense based on Mr. Ingram's exhaustion of remedies. I also find that Mr. Ingram has not shown that the state courts' decisions were contrary to or involved an unreasonable application of clearly established federal law, and that an evidentiary hearing is unnecessary because federal review of state court decisions on the merits, like those here, is limited to the state court record. *See Cullen*, 563 U.S. at 185; *Ellis v. Smith*, No. 21-2122, 2022 WL 3371008, at *2 (10th Cir. Aug. 16, 2022) (unpublished).[4] I therefore recommend that the Court deny Mr. Ingram's Petition.

## A. Exhaustion

To obtain relief under Section 2254, petitioners must show they have exhausted available state remedies. § 2254(b)(1)(A). However, a state may waive the exhaustion requirement by an express waiver through counsel. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.").

Mr. Ingram does not address whether he exhausted the state remedies available to him before seeking federal habeas review. (Doc. 1.) Even if he has not exhausted his claims, however, I find that Respondent has waived the exhaustion requirement through counsel by 1) expressly stating that he "does not dispute that Mr. Ingram has satisfied his exhaustion requirement," 2) setting forth the arguments Mr. Ingram made on direct appeal and habeas review but not arguing that Mr. Ingram failed to exhaust them, and 3) seeking dismissal with prejudice of Mr. Ingram's claims. (Doc. 11 at 1, 13); *see, e.g.*, *McCormick v. Parker*, 571 F. App'x 683, 686 (10th Cir. 2014) (holding that the state waived its exhaustion defense where it stated that the "[p]etitioner has

---

[4] Unpublished decisions are not binding precedent in the Tenth Circuit but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

exhausted his state court remedies to the grounds raised" and addressed the merits of the petitioner's arguments in its response); *Armendariz v. Moya*, No. CV 18-1144 WJ/CG, 2019 WL 6219230, at *4 (D.N.M. Nov. 21, 2019), *aff'd sub nom. Armendariz v. Vigil*, 834 F. App'x 454 (10th Cir. 2020) (holding that the exhaustion defense was waived where the respondents stated that the petitioner had "exhausted available state court remedies as to his claims and argued his claims should be dismissed on the merits with prejudice"). I therefore find that lack of exhaustion does not bar this Court's review of Mr. Ingram's arguments.

**B.  Ineffective Assistance of Counsel**

Mr. Ingram asserts that his trial counsel was ineffective because he pursued a defense theory that Mr. Ingram had been mistakenly identified as the perpetrator of Ms. Simpson's injuries and "fail[ed] to pursue a viable" alternative defense based on Mr. Ingram's alleged lack of capacity to form the intent to kill Ms. Simpson. (Doc. 1 at 7–8.) Mr. Ingram raised this argument in his Second State Habeas Petition. (Doc. 11-1 at 320–321.) The state district court denied the Second State Habeas Petition on the merits after an evidentiary hearing and the New Mexico Supreme Court denied his petition for review without discussion. (Doc. 11-2 at 157.) Hence, the Court's focus is on the state district court's decision. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (stating that when "a state supreme court decision[] does not come accompanied with" a rationale, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning").

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). For a defendant to succeed on a claim of ineffective assistance of counsel, he must

demonstrate both that "counsel's representation fell below an objective standard of reasonableness" and that "the deficient performance prejudiced the defense." *Id.* at 687. Courts "may address the performance and prejudice components in any order[] but need not address both if [the defendant] fails to make a sufficient showing of one." *Cooks v. Ward*, 165 F.3d 1283, 1292-93 (10th Cir. 1998). The *Strickland* test is clearly established federal law within the meaning of Section 2254(d). *Cullen*, 563 U.S. at 189.

In evaluating the first *Strickland* prong, a court's review of counsel's performance is "highly deferential," *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011), and defendants must overcome the "strong presumption" that their counsel "made all significant decisions in the exercise of reasonable professional judgment" and "counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689-90. Reviewing courts must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. A court is required not only to "give counsel 'the benefit of the doubt,' but also to 'affirmatively entertain the range of' possible reasons counsel 'may have had for proceeding as [he] did.'" *Cullen*, 563 U.S. at 196 (citation and internal quotation marks omitted). "It is 'rare' that constitutionally competent representation will require 'any one technique or approach.'" *Id.* (quoting *Harrington*, 562 U.S. at 106).

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Rather, to obtain relief, a "defendant must [also] show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

When asserting an ineffective assistance of counsel claim that the state courts have rejected on the merits, the petitioner's burden is even heavier: "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 689 and *Knowles*, *v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Cullen*, 563 U.S. at 190. In addition, "*Strickland* created a general standard, thus giving a state court . . . more latitude to reasonably determine that a defendant has not satisfied that standard." *Welch*, 639 F.3d at 1010 (quoting *Knowles*, 556 U.S. at 123). These principles limit the scope of federal review: federal courts "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)" and avoid asking whether "counsel's actions were reasonable." *Harrington*, 562 U.S. at 105. Instead, the proper question is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

After an evidentiary hearing, the state district court found that (1) "Mr. Ingram told Mr. Mondragon that he did not commit any of the acts he was charged with and that he had no information about what happened to the victim to assist Mr. Mondragon in the preparation of his defense," (2) "Mr. Ingram was insistent on pursuing a defense of mistaken identity," (3) the "investigator and Mr. Mondragon located a significant number of weaknesses in the State's case [including] not having adequate photo documentation, not requesting analysis of stains which may have been blood, and significant lines of questions that brought into doubt State witnesses['] biases, prejudices, and certainty of identification," (4) "Mr. Mondragon . . . competently and effectively pursued a defense strategy at trial regarding sufficiency of the evidence, mistaken

identity, credibility and biases of the witness, and clearly and effectively pointed out the insufficient and incompetent portions of the State's investigation," (5) "During the meetings between Mr. Mondragon and Mr. Ingram, Mr. Mondragon had no reason to believe or suspect that the defendant had any cognitive challenges such as defects in memory, language, or the ability to maintain focus and attention," and (6) "Mr. Ingram's statements to his lawyer[] that he did not commit the crime and was not present when the crime was occurring[] meant there was no reasonable basis to investigate the [']ability to form specific intent['] defense." (Doc. 11-2 at 149–151.)

To the extent Mr. Ingram challenges the state district court's findings of fact, I find that his assertions are insufficient. Mr. Ingram asserts that "Mr. Mondragon decided to pursue a defense of '[m]istaken [i]dentity' which "created a conflict between [Mr. Ingram] and Counsel." (Doc. 1 at 7.) He further states that Mr. Mondragon failed "to review the discovery that establishes that [Mr. Ingram] and . . . [Ms. Simpson] lived in the same 'household,' which rendered a defense of 'mistaken identity' implausible" (*id.*) and that Mr. Mondragon failed to interview one of the officers and to review the jailhouse phone recordings, which "allowed him to pursue a defense that was not viable." (*Id.* at 8.) These assertions do not amount to "clear and convincing evidence" that the state district court erred in finding that Mr. Ingram insisted that he was not the perpetrator or that Mr. Mondragon had no reason to mount a diminished capacity defense. § 2254(e)(1); *Welch*, 639 F.3d at 991. Moreover, the state district court based its findings of fact on its assessment of Mr. Ingram's and Mr. Mondragon's credibility at the evidentiary hearing, and under § 2254(d), "federal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983); *compare* (Doc. 11-2 at 132) *with* (Docs. 11-2 at 149–150 (rejecting Mr. Ingram's

proposed findings of fact after the evidentiary hearing). I therefore presume those findings are correct.

I find that the state district court reasonably applied the *Strickland* standard. *See* § 2254(d)(1). The state district court correctly noted that "choices of trial tactics and strategy are within the control of trial counsel." (*Id.*); *see Wainwright v. Sykes*, 433 U.S. 72, 93 (1977) (Burger, J., concurring) (stating that an attorney, "not the client, has the immediate and ultimate responsibility of deciding if and when to object, which witnesses, if any, to call, and what defenses to develop" and "such decisions must, as a practical matter, be made without consulting the client."). Given its findings of fact and the deference accorded to trial counsel's strategic decisions under *Strickland*, it was reasonable for the state district court to conclude that Mr. Mondragon exercised his discretion by pursuing a "mistaken identity" defense and that it "was objectively reasonable for defense counsel . . . to make the decision to not pursue a lack of intent defense, as that would have challenged [Mr. Ingram's] credibility with the jury and caused confusion regarding Mr. Ingram's defense." (Doc. 11-2 at 152.) Having concluded that Mr. Mondragon was not deficient, it was not necessary for the state district court to address *Strickland*'s second prong. *Cooks*, 165 F.3d at 1292-93 (stating that courts need not address both *Strickland* prongs if one is not met).

Considering the state district court's findings of fact and the doubly deferential review of ineffectiveness claims on § 2254 review, I find that "there is [a] reasonable argument that [Mr. Mondragon] satisfied *Strickland*'s deferential standard" and, therefore, Mr. Ingram has not established a basis for federal relief. *Harrington*, 562 U.S. at 105. I therefore recommend that the Court DENY Mr. Ingram's request for relief on this ground.

**C.  Evidence of Intent to Commit First Degree Murder**

Mr. Ingram argues that, because he intended "to confront his brother with his girlfriend to discuss the infidelities" and "never deviated from that intent," there was "no evidence of intent to commit first degree murder." (Doc. 1 at 12 (emphasis omitted).) This argument was rejected by the New Mexico Court of Appeals on direct appeal. (Doc. 11-1 at 236.) In its decision, the New Mexico Court of Appeals viewed "the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." (*Id*.) Applying this standard, it noted that "[t]he jury was free to reject [Mr. Ingram's] version of events" and held that "the evidence was sufficient to support [his] convictions." (*Id*.)

Under federal law, "[t]he evidence is sufficient to support a conviction whenever, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)). On federal habeas review, a "state-court decision rejecting a sufficiency challenge may" be overturned only if the "decision was 'objectively unreasonable.'" *Parker*, 567 U.S. at 43 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2, (2011)). Hence, the question before the Court is whether the New Mexico Court of Appeals "reasonably decided that [*any*] 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Torres v. Lytle*, 461 F.3d 1303, 1313 (10th Cir. 2006) (quoting *Jackson*, 443 U.S. at 319)).

I find that the Court of Appeals' decision was reasonable because a rational trier of fact could have found from the testimony about the severity of Ms. Simpson's injuries and Mr. Ingram's own actions and statements that he formed a deliberate intention to kill Ms. Simpson either before he went to her house or during the five to ten minutes during which he beat her while

on her porch. (*See* Doc. 11-1 at 236; CD, Sept. 13, 2010, at 10:54:52.) The evidence included

testimony that:

> In the months before the beating, Ms. Simpson was a complaining witness against Mr. Ingram leading to him being twice jailed and when he got out of jail the first time he began harassing and threatening Ms. Simpson. (CD, Sept. 13, 2010, at 10:26:15-10:27:08; 11:51:51-11:52:25.)

> Three days after getting out of jail the second time, Mr. Ingram beat Ms. Simpson in the head for five to ten minutes until "blood [was] pouring out of [her] face like water," and he tried to tear her mouth as he stated he was going to rip her face off. (CD, Sept. 13, 2010, at 10:44:00, 10:51:00 – 10:53:30; 11:17:40-11:18:00; 11:19:29-11:20:10.)

> Mr. Ingram told Ms. Simpson that he had come to kill her, accused her of having a relationship with his brother, and then later said to her, "We're both gonna die tonight." (*Id.* at 10:50:53; 11:01:38 –11:01:58; 11:02:25 – 11:02:35.)

> Ms. Ingram beat Ms. Simpson so badly she was unrecognizable, both of her eyes were black and swollen shut, her face was swollen and bruised, she suffered a severe gash under her right eye which required eight stitches, and her eye socket was fractured in two places. (CD, Sept. 9, 2010, at 9:54:35, 9:58:34, 16:58:15 – 16:58:52; Sept. 10, 2010, at 11:19:35, 11:22:40; Sept. 13, 2010, at 11:05:00-11:06:08; 11:06:39–11:08:40; 11:27:00-11:27:56.)

> Ms. Simpson lost so much blood after the beating on her porch that when her neighbor saw the puddles of blood she lost while seeking help at his property, he knew it was serious and considered whether she had been stabbed or shot. (CD, Sept. 10, 2010, at 4:02:25-4:03:14; 4:06:16 – 4:08:37.)

In addition, the jury heard a recorded telephone call on which Mr. Ingram could be heard

stating, "She's lucky I didn't kill her." (CD, Sept. 13, 2010, at 9:47:50.) Viewing this evidence in

the light most favorable to the verdicts, a rational trier of fact could have found that Mr. Ingram

formed a deliberate intent to kill Ms. Simpson. I therefore find that the Court of Appeals' decision

was not objectively unreasonable. *Torres*, 461 F.3d at 1313. Mr. Ingram's insufficient evidence

claim should be DENIED.

## D.  Double Jeopardy

Mr. Ingram next asserts that convictions for both kidnapping and attempted murder subject him to double jeopardy. (Doc. 1 at 8.) He made the same argument in his Second State Habeas Petition and the state district court ordered Respondent to address it, including specifically whether his conduct was unitary. (Doc. 11-1 at 319, 331.) Respondent addressed the issue in its Response. (*Id*. at 335.) The state district court later denied the Second State Habeas Petition without a written explanation of its ruling on the double jeopardy issue. (*Id*. at 148–152.) The New Mexico Supreme Court denied Mr. Ingram's petition for writ of certiorari without analysis. (Doc. 11-3 at 4.)

I first find that, despite its lack of explanation, the state district court's decision was "on the merits" because there is no indication that the state district court declined to consider the merits of Mr. Ingram's double jeopardy claim. *Gipson*, 376 F.3d at 1196. To the contrary, it specifically ordered briefing from Respondent on the issue. (Doc. 11-1 at 331; *see also* 335–337.) The proper analysis, therefore, requires the Court to "determine what arguments or theories . . . could have supported[] the state court's decision; and then . . . whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with" a relevant Supreme Court holding. *Harrington*, 562 U.S. at 102. That analysis begins with federal law on Mr. Ingram's rights under the Double Jeopardy Clause of the United States Constitution. U.S. Const. amend. V.

The "Double Jeopardy Clause . . . prevent[s] the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). Where, as here, a defendant argues that he has been punished twice for the same conduct, "the test to be applied to determine whether" the legislature intended to punish "two offenses or only one, is whether each [statute] requires proof of a fact which the other does not." *United States v. Raymer,* 941 F.2d 1031, 1043–44 (10th Cir. 1991) (quoting *Blockburger v. United States,* 284 U.S. 299,

304 (1932)). If each statute "requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *Iannelli v. United States,* 420 U.S. 770, 785 n.17 (1975).

Before applying the *Blockburger* test, however, courts must first determine whether the conduct underlying the convictions was, in fact, the same, i.e., "unitary." *Swafford v. State,*[5] 1991-NMSC-043, ¶ 25, 810 P.2d 1223 ("The first part of our inquiry asks the question that Supreme Court precedents [like *Blockburger*] assume to be true: whether the conduct underlying the offenses is unitary[.]"). "[I]f the conduct is separate and distinct, [the double jeopardy] inquiry is at an end." *Swafford*, 1991-NMSC-043, ¶ 28; *Lucero v. Kerby*, 133 F.3d 1299, 1316 (10th Cir. 1998) ("If the conduct is non-unitary, then multiple punishments would not violate the Double Jeopardy Clause.").

Conduct is not unitary when "'sufficient indicia of distinctness' separate the illegal acts[.]" *State v. Sena*, 2020-NMSC-011, ¶ 46, 470 P.3d 227, 241 (quoting *Swafford*, 1991-NMSC-043, ¶¶ 26-28, 810 P.2d 1223). Indicia of distinctness are sufficient when, for example, there is "'an identifiable point at which one of the charged crimes had been completed and the other not yet committed,'" *Ellis*, 2022 WL 3371008, at *5 (quoting *State v. DeGraff*, 2006-NMSC-011, ¶ 27, 131 P.3d 61, 71), or "when the force used to commit a crime is separate from the force used to commit another crime." *Sena*, 2020-NMSC-011, ¶ 46, 470 P.3d at 242. "If two events are sufficiently separated by either time or space (in the sense of physical distance between the places

---

[5] While this Court is not "bound by state court rulings on ultimate constitutional questions," it "defer[s] to [the New Mexico courts'] interpretation of state law in determining whether an incident constitutes one or more than one offense for double jeopardy purposes[.]" *Thomas v. Kerby*, 44 F.3d 884, 887 (10th Cir. 1995) (quoting *Mansfield v. Champion*, 992 F.2d 1098, 1100 (10th Cir.1993)).

where the acts occurred), then it is a fairly simple task to distinguish the acts." *Swafford*, 1991-NMSC-043, ¶ 28, 810 P.2d at 1233–34.

I find that the evidence at trial permitted a finding that the conduct forming the basis for the attempted murder conviction was distinct both in time and location from the conduct underlying the kidnapping conviction and that, therefore, the state district court reasonably could have found that Mr. Ingram's conduct was not unitary. The State presented evidence that Mr. Ingram viciously beat Ms. Simpson's head and face while on her porch for five to ten minutes, and that Mr. Ingram told Ms. Simpson he was going to rip off her face as he tore at her mouth and then later admitted he had come to kill her and that she was "lucky [he] didn't kill her." (CD, September 13, 2010, at 10:44:00, 10:51:00 – 10:53:30; 11:01:38 –11:01:58; 11:02:25 – 11:02:35; 9:47:50; 11:17:40-11:18:00.) This evidence supports a finding that he "began to do an act that constituted a substantial part" of the crime of attempted murder when he brutally battered and severely injured Ms. Simpson while she was on her porch. The crime of attempted murder was completed on Ms. Simpson's porch.

As discussed in the factual background set forth above, the evidence further shows that, after attempting to murder Ms. Simpson, Mr. Ingram demanded that Ms. Simpson give him her car keys. Ms. Simpson did not give Mr. Ingram her keys, but instead activated her car alarm and threw the keys toward her fence. Mr. Ingram then dragged Ms. Simpson into her yard to retrieve the keys and directed her to get into her vehicle, and although Ms. Simpson did get into the vehicle as he instructed, she escaped from another side of it while Mr. Ingram entered the vehicle. Ms. Simpson was able to then run across the street to her neighbors' front door while yelling for help, and the commotion prompted her neighbor to alert the police. Before the police arrived, Mr. Ingram pursued, captured, and dragged a struggling Ms. Simpson by her hair away from the neighbor's

property and back across the street where he then forced her onto the back floorboard of her car. As police arrived to render aid and to apprehend Mr. Ingram, he drove Ms. Simpson away from her home. During his flight from police, Mr. Ingram reached into the back of the car, and struck Ms. Simpson several more times as she lay bleeding on the floorboard. This evidence overwhelmingly supported a finding that Mr. Ingram "took, restrained [and] transported" Ms. Simpson against her will at a different time and in a different location from the beating he administered on her front porch. Hence, the state district court reasonably concluded that the kidnapping and attempted murder convictions were based on distinct, non-unitary conduct.

Mr. Ingram asserts that his "intentions remained the same from the beginning of the events until the end" and that his "actions were unitary and never diverted toward a secondary and separate course of action." (Doc. 1 at 11.) That Mr. Ingram believes that the evidence supports a finding that his conduct was unitary does not entitle him to relief. Rather, on review under Section 2254, the Court must defer to the state court's decision unless there is no reasonable basis for it. *Gipson*, 376 F.3d at 1197 (where the state court did not explain its decision, courts should "defer to the [state court's] decision unless . . . its result—not its rationale—is 'legally or factually unreasonable'" (quoting *Aycox*, 196 F3d at 1178). Having found that the evidence supports a finding that the conduct underlying his convictions was not unitary, I further find that the state district court's denial of Mr. Ingram's Second State Habeas Petition was reasonable. *See Quintana v. Mulheron*, 788 F. App'x 604, 609 (10th Cir. 2019) (a § 2254 petitioner "may succeed on his claim only if he can show" the state court's decision was unreasonable); *Ellis*, 2022 WL 3371008, at *6 (holding that,"[b]ecause there was an identifiable point at which [the first crime] was completed and the [second crime] had not yet been committed, the crimes were nonunitary under New Mexico law" and denying a certificate of appealability of the dismissal of the petitioner's

§ 2254 double jeopardy claim). I therefore recommend that the Court deny Mr. Ingram's Petition as to this ground.

**E.  Denied a Fair Trial**

In his final two claims, Mr. Ingram asserts that he was denied a fair trial. In the Venue Claim, he argues that the trial court erred in denying his motion for a change of venue because, "with the extensive pre-trial publicity on this case it was impossible to form a jury that hadn't been saturated with the negative media coverage." (Doc. 1 at 13.) In the Jury Claim, he maintains he was "deprived of a jury of his peers as no African American jurors were provided." (*Id.*)

Respondent argues that federal review of the Venue Claim is barred because it was procedurally defaulted when the Court of Appeals declined to reach it because it was not preserved. (Doc. 11 at 18.) Respondent is correct that a federal court may not grant habeas relief "when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman v. Thompson,* 501 U.S. 722, 729–30 (1991). However, "[s]tate procedural bars are not immortal . . . ; they may expire because of later actions by state courts." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). If "the last state court to be presented with a particular federal claim reaches the merits, it removes any [procedural default] bar to federal-court review that might otherwise have been available." *Id.*

Respondent does not address the fact that, on review of the First State Habeas Petition, the state district court addressed the Venue Claim on its merits. (Doc. 11-1 at 300.) By not addressing whether the procedural bar imposed by the Court of Appeals' ruling "expired" when the state district court later ruled on the merits of this issue, Respondent has failed to demonstrate that a procedural default bars federal habeas review of the Venue Claim. *See Tryon v. Quick*, 81 F.4th 1110, 1139 (10th Cir. 2023) ("A procedural bar or an anticipatory procedural bar creates an

affirmative defense which the state may raise."); *cf. Bramlett v. Champion*, 28 F. App'x 868, 873 (10th Cir. 2001) (holding that the respondent's "vague assertion" that a claim was procedurally barred was "insufficient to preclude consideration of the merits of" the petitioner's claim). In addition, Respondent does not assert a procedural-default defense to the Jury Claim. I therefore find that neither the Venue Claim nor the Jury Claim are barred from review. *See* (Doc. 11 at 18, 28–29.)

Nevertheless, I recommend denying both claims. As to the Venue Claim, "[b]ecause [Mr. Ingram] moved for a venue change under state law, his venue claims are not entitled to federal habeas relief." *Stallings v. Santistevan*, No. 21-2115, 2022 WL 2824261, at *2 (10th Cir. July 20, 2022); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Moreover, "[i]t is not required . . . that the jurors be totally ignorant of the facts and issues involved" in a case. *Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* Here, the state district court denied the change of venue motion after voir dire and, on review of the First State Habeas Petition, found that the "jury panel showed no indicia of widespread community knowledge of the facts of the case, or a widespread community belief in regards to [Mr. Ingram's] guilt or innocence . . . ." (Doc. 11-1 at 300.) It noted, "No evidence was presented prior to trial that would justify a change of venue, and no evidence [was] presented in" litigation of the First State Habeas Petition. (*Id.*) Mr. Ingram does not challenge those findings of fact with clear and convincing evidence or explain how the jurors were unable to judge his case impartially. I therefore recommend denying the Venue Claim.

As to the Jury Claim, I find that Mr. Ingram does not assert a violation of his constitutional right to a jury of his peers and that, even if he had, the state district court's decision on the Jury Claim was not an unreasonable application of Supreme Court precedent. *See Trice v. Ward*, 196 F.3d 1151, 1164 (10th Cir. 1999) (the question on federal habeas review of a Sixth Amendment claim, like Mr. Ingram's, is whether the state court's decision "represents a reasonable application of" Supreme Court precedent).

"[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). Hence, "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id*. at 538. However, the Sixth Amendment does not require that "petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population [and d]efendants are not entitled to a jury of any particular composition[.]" *Id*. Rather, to demonstrate a violation of his constitutional right, Mr. Ingram had to show

> (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364 (1979). "[S]imply demonstrating the racial makeup of one jury pool does not demonstrate . . . a systematic exclusion of African[]Americans or other minorities." *Trice*, 196 F.3d at 1164 n.3; *United States v. Hill*, 197 F.3d 436, 445 (10th Cir. 1999) ("[E]vidence of a discrepancy on a single venire panel[] is insufficient to demonstrate systematic exclusion").

In the Petition, Mr. Ingram reiterates that he "was deprived of a jury of his peers as no African American jurors were provided." (Doc. 1 at 13.) This conclusory assertion is not sufficient

to raise a constitutional challenge because he has "no right to a 'petit jury composed in whole or in part of persons of [his] own race[.]'" *Powers v. Ohio*, 499 U.S. 400, 404 (1991) (quoting *Strauder v. West Virginia*, 100 U.S. 303, 305 (1880) (abrogated on other grounds by *Taylor,* 419 U.S. 522)). Even if Mr. Ingram had stated a constitutional claim, he has not met his burden to show that the state district court's decision is contrary to clearly established law stated in *Duren*, or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d). First, Mr. Ingram does not challenge the state district court's findings of fact regarding the Quay County census or the jury selection process. *Quick*, 79 F.4th at 1104 (state court findings of fact are entitled to a presumption of correctness unless rebutted by clear and convincing evidence); *Meek v. Martin*, 74 F.4th 1223, 1251 (10th Cir. July 25, 2023) (burden of showing that factual findings are objectively unreasonable "falls squarely on the petitioner's shoulders"); *Robinson v. Davis*, No. 10-CV-02692-REB, 2011 WL 5295201, at *10 (D. Colo. Nov. 3, 2011 (the petitioner's "failure to present the state trial court with any evidence to show systemic racial disparity in jury venires in [the county] is fatal to a constitutional challenge to the cross section of the jury under *Duren*."). Second, he does not show that the state district court improperly applied the *Duren* standards when it considered the number of African Americans in Quay County and whether African Americans were excluded from the jury pool or during jury selection.

Mr. Ingram's conclusory statements about the racial makeup of the jury are not enough to show that African Americans are not fairly represented or were systematically excluded from the jury selection process in Quay County. *See United States v. Ruiz–Castro,* 92 F.3d 1519, 1527 (10th Cir.1996) (concluding that defendant's argument about racial makeup of single venire failed to

establish systematic exclusion of minorities) (overruled on other grounds by *United States v. Flowers*, 464 F.3d 1127, 1130 n.1 (10th Cir. 2006)).

Furthermore, I find that the state district court reasonably applied *Duren* given the dearth of evidence presented by Mr. Ingram. *See Berghuis v. Smith*, 559 U.S. 314, 331 (2010) (the state court reasonably applied *Duren* where the evidence presented by the defendant gave it "little reason to conclude that the [allegedly faulty practice] had a significantly adverse impact on the representation of African–Americans on" jury pools); *see also Trice*, 196 F.3d at 1164 (holding that the state court reasonably applied *Duren* even though it did not expressly address all the parts of the *Duren* test and that the state court's denial of the petitioner's claim was reasonable given the evidence presented by the petitioner); *United States v. Edwards,* 69 F.3d 419, 437 (10th Cir. 1995) (concluding that defendant "failed to demonstrate a prima facie violation of the fair-cross-section requirement" because he did not show "a 'systematic exclusion' of African–Americans"). I therefore recommend that the Court DENY the Jury Claim.

## IV.    CONCLUSION

For all of the foregoing reasons, I RECOMMEND that the Court DENY Mr. Ingram's Petition in its entirety (Doc. 1) and DISMISS the Petition WITH PREJUDICE.

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---